**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**
_____

**EUNICE FULTON,**

                 **Plaintiff,**　　　　　　　　**1:05-cv-1622
　　　　　　　　　　　　　　　　　　　　　　　　(GLS/CFH)**

                 **v.**

**GLENN S. GOORD et al.**,

                 **Defendants.**
_____

| **APPEARANCES:** | **OF COUNSEL:** |
|---|---|
| **FOR THE PLAINTIFF:**<br>Eunice Fulton<br>Pro Se<br>420 West 19th Street  #10C<br>New York, NY 10011 | |
| **FOR THE DEFENDANTS:**<br>HON. ERIC T. SCHNEIDERMAN<br>New York State Attorney General<br>Albany Office<br>The Capitol<br>Albany, NY 12224 | KELLY L. MUNKWITZ<br>Assistant Attorney General |

**Gary L. Sharpe
Chief Judge**

## MEMORANDUM-DECISION AND ORDER

### I. Introduction

Plaintiff *pro se* Eunice Fulton commenced this action under the Americans with Disabilities Act (ADA) and Rehabilitation Act, alleging that defendants violated her rights by failing to accommodate her disability in a

way that would permit her to visit her incarcerated husband.  (*See* Am. Compl., Dkt. No. 34.)  Pending is defendants' motion for summary judgment.  (*See* Dkt. No. 53.)  For the reasons that follow, defendants' motion is granted and the Amended Complaint is dismissed.

## II.  **Facts**[1]

On June 9, 2005, Fulton's husband was admitted to New York State Department of Corrections and Community Supervision's (DOCCS)[2] "Downstate inmate processing facility to begin a criminal sentence of two-to-four years."  (Am. Compl. ¶ 20.)  While at the processing facility, Mr. Fulton verbally requested assignment to a downstate facility based on Fulton's disability.  (*See id.* ¶ 21.)  This request was denied, and Mr. Fulton was assigned to Altona Correctional Facility, which is over 320 miles from Fulton's home.  (*See id.* ¶ 21, 23-24.)  Thereafter, Fulton sought an accommodation from DOCCS which would allow her to participate in the

---

[1] The facts are limited to those relevant to the resolution of the current motion.

[2] DOCCS was formerly the New York State Department of Correctional Services.  *See People v. Paulin*, 17 N.Y.3d 238, 243 n. (2011).  Thus, the court refers to that agency by its current name despite the fact that Fulton sued it under its former name.

Inmate Visitor Program (IVP).[3]  (*See id.* ¶ 26.)

### III. Procedural History

On October 3, 2006, this court dismissed Fulton's Complaint for lack of standing and failure to state a cause of action.  (*See* Dkt. No. 22.)  Thereafter, Fulton filed a timely appeal to the Second Circuit.  (*See* Dkt. No. 24.)  The Second Circuit vacated this court's decision, remanded the case, and granted Fulton leave to file an Amended Complaint.  *See Fulton v. Goord*, 591 F.3d 37, 45 (2d Cir. 2009).  After filing an Amended Complaint, Fulton retained counsel.  (*See* Dkt. No. 37.)  On May 31, 2011, however, Judge Homer granted counsel's request to withdraw from the representation.  (*See* Dkt. Nos. 47, 48.)

Defendants moved for summary judgment on February 13, 2012, and Fulton failed to respond.  (*See* Dkt. No. 53.)  On February 28, the court *sua sponte* extended the time in which Fulton could respond to the motion and warned her of the consequences of failing to do so.  (*See* Dkt. No. 54.)  Nevertheless, Fulton did not respond.

On July 24, 2012, this court issued a text order requesting that the

---

[3] The scope of Fulton's request is a point of contention between the parties, and is discussed more fully below.  (*Compare* Am. Compl. ¶ 1, *with* Dkt. No. 53, Attach. 14 at 4-5.)

3

parties address the issue of standing. Defendants filed a letter brief on the issue, (*see* Dkt. No. 55), but, despite the passage of the filing deadline, Fulton once again failed to respond.

## IV. Standard of Review

The standard of review under Fed. R. Civ. P. 56 is well established and will not be repeated here. For a full discussion of the standard, the court refers the parties to its decision in *Wagner v. Swarts*, 827 F. Supp. 2d 85, 92 (N.D.N.Y. 2011).

## V. Discussion

### A. Statutory Framework

Fulton's Amended Complaint seeks, *inter alia,* injunctive relief and compensatory damages under Title II of the ADA and the Rehabilitation Act. (*See* Am. Compl.) Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, under the Rehabilitation Act, "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied

4

the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).  The same standard generally applies to claims under Title II of the ADA and claims under the Rehabilitation Act.  *See Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 85 (2d Cir. 2004).

## B.   Injunctive Relief

Defendants argue first, and the court agrees, that, to the extent Fulton seeks injunctive relief, her claims must be dismissed as moot.  (*See* Dkt. No. 55 at 2.)  A case becomes moot "when the issues presented are no longer 'live' or the parties 'lack a legally cognizable interest in the outcome.'" *Blackwelder v. Safnauer*, 866 F.2d 548, 551 (2d Cir. 1989) (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982)).  Because Fulton's husband is no longer incarcerated, her claims for injunctive relief are dismissed as moot.

## C.   Monetary Damages

In addition to injunctive relief, Fulton seeks monetary damages.  (*See* Am. Compl. at 14.)  In order to obtain money damages for a violation of the ADA, a plaintiff must "show not only that there was a violation, but that such violation was motivated by either discriminatory animus or ill will

5

stemming from plaintiff's disability." *Powell*, 364 F.3d at 89.[4]  Unlike the ADA, money damages may be recovered for a violation of the Rehabilitation Act upon a showing that "any violation resulted from 'deliberate indifference' to the rights the disabled enjoy under the Act." *Id.* (citation omitted).  Because Fulton fails to allege discriminatory animus or ill will, (*see* Am. Compl.), her ADA claims fail to the extent that they seek money damages.  While it is not clear that Fulton's contention that DOCCS failed to "take any steps to even consider" her request for an accommodation constitutes deliberate indifference, the court, in an abundance of caution, addresses the merits of her Rehabilitation Act claim. (*See id.* ¶ 1.)

## D. Reasonable Accommodation

To establish a prima facie claim under the Rehabilitation Act, a plaintiff must demonstrate: "(1) she is a 'qualified individual' with a disability; (2) the defendants are subject to [the Rehabilitation Act]; and (3) she was denied the opportunity to participate in or benefit from defendants'

---

[4] "To establish discriminatory animus,. . ., a plaintiff may rely on a burden-shifting technique similar to that adopted in *McDonnell Douglas Corp. v. Green*, . . . or a motivating-factor analysis similar to that set out in *Price Waterhouse v. Hopkins*." *Smith v. State Univ. of N.Y.*, No. 1:00-CV1454, 2003 WL 1937208, at *5 (N.D.N.Y. Apr. 23, 2003).

6

services, programs, or activities, or [was] otherwise discriminated against by defendants, by reason of [her] disabilit[y]." *Brief v. Albert Einstein Coll. of Med.*, 423 F. App'x 88, 90 (2d Cir. 2011) (internal quotation marks and citations omitted). The third element may be premised on "any of three available theories: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation." *Id.* (internal quotation marks and citation omitted). To state a failure-to-accommodate claim, "a plaintiff must assert that disabled individuals lack access to a given government resource and suggest a plausible method for remedying that lack of access." *Meekins v. City of N.Y., N.Y.*, 524 F. Supp. 2d 402, 407 (S.D.N.Y. 2007) (citation omitted).

Defendants concede that Fulton is a "qualified individual" and that they are subject to the Rehabilitation Act, and seek summary judgment solely on the grounds that, because Fulton was not denied a reasonable accommodation, she was not excluded from the IVP by reason of her disability. (*See* Dkt. No. 53, Attach. 14 at 9-13.) The court agrees.[5]

---

[5] Because claims brought under the ADA and the Rehabilitation Act are subject to a nearly-identical analysis, *see Fulton v. Goord*, 591 F.3d 37, 42 n.1 (2d Cir. 2009), Fulton's inability to succeed on her Rehabilitation Act claim is indicative of a parallel failure under the ADA. In fact, the Rehabilitation Act is more stringent than the ADA in that "under

7

### *1. Scope of Accommodation Requested*

Defendants predicate their request for summary judgment on their contention that, despite the Second Circuit's proclamation to the contrary, the only accommodation requested by Fulton was the transfer of her husband to a downstate correctional facility. (*See id.* at 4-6.) While Fulton alleges in her Amended Complaint that she requested "a transfer or another reasonable accommodation," (Am. Compl. ¶ 4), this contention is belied by the record evidence.

Fulton's accommodation request was made in the form of an October 20, 2005 letter to Commissioner Goord. (*See* Dkt. No. 53, Attach. 7 at 4-5.) Although Fulton's letter begins with ambiguous language requesting "reasonable accommodations" which would allow her "to participate in the visiting program," it is evident in the closing paragraph that the only accommodation contemplated is the transfer of her husband. (*Id.* at 4.) Not only does Fulton notify Goord that a downstate transfer would permit her and her child to visit Mr. Fulton, she lists three downstate facilities to

---

[that Act] the defendant must have discriminated against the plaintiff 'solely' because of plaintiff's disability; under the ADA, it is enough if the plaintiff's disability was a motivating factor in the discrimination." *Montgomery v. Chertoff*, No. 03 CV 5387, 2007 WL 1233551, at *4 (E.D.N.Y. Apr. 25, 2007) (citation omitted).

which she would be able to travel.  (*See id.*)  Finally, she closes her letter by imploring Goord to "understand [her] situation and exercise [his] discretion to move [her] husband closer to the city."  (*Id.*)

The narrow focus of Fulton's request need not be gleaned only from her letter, though, as she confirms as much under oath.  (*See* Dkt. No. 53, Attach. 9 at 53-58.)  In a sworn deposition, Fulton admits that, in writing the October 20 letter, she was "[s]eeking that [Goord] should move [her husband] to another facility that is more next to New York, downstate somewhere."  (*Id.* at 56.)  While she raises the possibility of using video conferencing as a means of remotely visiting her husband—a medium of visitation suggested by the Second Circuit, *see Fulton*, 591 F.3d at 44 n.3—Fulton admits that she was "not writing that on [the October 20] letter." (*Id.* at 55.)  Finally, when asked whether a transfer was all that she was requesting in the letter to Goord, Fulton responds, "[y]es."  (*Id.* at 58.)  In addition to the October 20 letter, Fulton contends that she made telephone calls to DOCCS several times, but admits that the purpose of those calls was to request the transfer of her husband.  (*See id.* at 67.)  In light of Fulton's letter and her own admissions, it is clear that the accommodation which she requested of defendants was limited to the transfer of her

9

husband to a downstate facility.

### 2. Reasonableness of Accommodation

The question becomes, then, whether Fulton's request that her husband be transferred to a downstate correctional facility was reasonable. While the Rehabilitation Act, like the ADA, requires the provision of reasonable accommodations for qualified disabled individuals, such accommodations "should not impose undue financial and administrative burdens, nor should a covered entity be required to make fundamental or substantial modifications." *Brief*, 423 F. App'x at 91 (internal quotation marks and citations omitted). Furthermore, "a defendant need not make an accommodation at all if the requested accommodation would fundamentally alter the nature of the service, program, or activity." *Id.* at 91 (internal quotation marks and citations omitted).

The transfer of inmates within the DOCCS system is administered by the Office of Classification and Movement (OCM). (*See* Dkt. No. 53, Attach. 5 ¶ 1.) The OCM handles inmate transfers in accordance with an "area of preference" policy which was adopted in 1995 and amended in 2000. (*Id.* ¶¶ 23-24.) Under this policy, an inmate's eligibility for transfer is predicated on objective criteria falling within three categories: "the time they

10

have in a hub, satisfactory disciplinary adjustment and appropriate programming."[6]  (*Id.* ¶ 25.)  The area of preference policy provides inmates with "an equal opportunity to earn a transfer to a correctional facility near their" desired location, and "encourages inmates to follow Department rules and to take advantage of the Department's educational, treatment and vocational programs."  (*Id.* ¶ 22.)  Adoption of the area of preference policy reduced the length of time inmates spend on a transfer wait list and relieved the administrative burden borne by the OCM in administering the transfer process.  (*See id.* ¶ 23.)

In spite of DOCCS' objective transfer policy, the OCM receives nearly-daily requests for transfers based on personal circumstances, the "vast majority" of which seek relocation to downstate facilities.  (*See id.* ¶¶

---

[6]
> [A] maximum security inmate, including a maximum security inmate eligible for reduced security, could request an area of preference transfer at a quarterly review after being in the Department's custody for one year, and in general confinement for six months.  A medium security inmate [is] required to have two years or more in the hub and a favorable disciplinary adjustment . . . [and must] successfully participate in major programs including academic, vocational, work, substance abuse, aggression replacement or sex offender counseling programs.

(Dkt. No. 53, Attach. 5 ¶ 23-24.)

4, 26.) To grant an individual transfer request—like that sought by Fulton—"would require [the OCM] to transfer an inmate ahead of many other inmates who have satisfied the area of preference criteria." (*Id.* ¶ 25.) To require such an exception would undoubtedly impose a great administrative burden on the OCM and DOCCS, and would require a substantial modification of the area of preference transfer policy, which in turn would affect administration of the IVP. Fulton's request, therefore, was unreasonable, and defendants' did not discriminate against her solely by reason of her disability for failing to grant it. Accordingly, Fulton has failed to establish a claim of discrimination under the Rehabilitation Act, defendants are entitled to summary judgment, and Fulton's Amended Complaint is dismissed in its entirety.

## VI. Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 53) is **GRANTED**; and it is further

**ORDERED** that Fulton's Amended Complaint (Dkt. No. 34) is **DISMISSED** in its entirety; and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties by mail and certified mail.

**IT IS SO ORDERED.**

September 26, 2012
Albany, New York

*Gary L. Sharpe*
Gary L. Sharpe
Chief Judge
U.S. District Court